IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge John L. Kane

Criminal Action No. **12-cr-00069**

**UNITED STATES OF AMERICA**,

    Plaintiff,

v.

**1.  TIMOTHY JOHN VANDERWERFF**,

    Defendant.

ORDER

Kane, J.

    The prosecution of Defendant Timothy John Vanderwerff has been characteristic of modern criminal justice.  Shortly after the government filed a three-count indictment charging Mr. Vanderwerff with receiving and possessing child pornography shipped or transmitted in a means affecting interstate and foreign commerce, the parties reached a tentative disposition and requested a change of plea hearing.  In anticipation of that hearing, they submitted a proposed plea agreement whereby Mr. Vanderwerff agreed to plead guilty to Count 2 of the indictment in exchange for the dismissal of Counts 1 and 3.  The proposed plea agreement contained a waiver of Mr. Vanderwerff's statutory right to appeal any matter in connection with his prosecution.

    The commonplace nature of these proceedings does not obviate the need to carefully consider the appropriateness of the parties' negotiated disposition.  Quite the contrary, I owe a

duty to the public and to Mr. Vanderwerff to conduct an individualized inquiry into the terms of the proposed plea agreement in light of the facts and circumstances particular to the charged offenses.

## FACTS

The parties have agreed to the following statement of facts:

In October 2009, law enforcement officials were contacted by the defendant's sister-in-law. She told law enforcement [officers] that the defendant's wife, Deni Vanderwerff, found thousands of images of child pornography on the defendant's computer. Deni also believed the defendant had an improper infatuation with an 11 year-old neighbor. Deni overheard the young girl tell the defendant, "All you want to do is take down my pants."

On October 6, 2009, law enforcement authorities interviewed Deni Vanderwerff. She confirmed the events described by her sister. Deni believed the defendant was continuing to view child pornography on the computer by using the internet. Deni also said that she found a large stack of child pornography pictures that appeared to have been printed off the internet. Deni put these pictures into a suitcase in the attic.

On October 6, 2009, law enforcement officers obtained a state search warrant to search the defendant's home and seize the computer and images of child pornography. The warrant was executed at the defendant's home that day. Agents from the FBI and local law enforcement interviewed the defendant during the search. The defendant admitted that he possessed the child pornography found on the computer. The defendant told the agents he began looking at pornography on the internet approximately five years prior. The defendant said he was initially interested in adult pornography, but later began looking at child pornography when adult pornography ceased to sexually excite him. The defendant said he liked to look at child pornography with images of children between the ages of eight and 11 years old. the defendant admitted that the images sexually aroused him and that he masturbated to those child pornography images.

The defendant said he obtained all of his child pornography from the internet. He would search the internet for child pornography using search engines, such as Google. The defendant would save his favorite websites on his computer. The defendant also said that he would download child pornography images from the internet and save them on his computer in an electronic folder entitled "New Folder." The defendant would occasionally "clean out" the child pornography from that folder by deleting images and emptying those files from the computer's electronic recycle bin. The defendant believed there were approximately 25 images saved in the "New Folder" on his computer.

The defendant admitted that he also printed copies of child pornography

images he found on the internet. During the search of the home, law enforcement officers found 53 pages of printed child pornography images in a suitcase in the attic, as described by the defendant's wife. The printed pages were shown to the defendant, who admitted he had printed the images from the internet.

A Dell desktop computer and hard drive were seized from the home along with the printed child pornography images. The computer and hard drive were submitted to the Rocky Mountain Regional Computer Forensic Laboratory (RMRCFL) for examination. The forensic examination located more than 900 files containing images of child pornography on the computer. There were 27 files of child pornography images located in the "New Folder" section on the computer described by the defendant. The computer had approximately 292 files containing images of child pornography with prepubescent minors. There were approximately 27 files containing images of child pornography involving sadistic or masochistic conduct. There were 2 video files showing child pornography involving prepubescent minors. Additionally, there were eight "erotic" stories describing adults having sex with children. The forensic laboratory also discovered websites saved on the defendant's computer as "favorites." These websites include those named "Retro Child Porn," "Topless Lolita," and "Kids Fucker TGP" as well as others.

The child pornography images from the computer and the printed pages were sent to the National Center for Missing and Exploited Children (NCMEC) for review. The Child Victim Identification Program (CVIP) at NCMEC catalogues known child pornography images and known victims of child pornography. CVIP discovered 87 "known" image files of child pornography on the defendant's computer from 25 different series of known child pornography. All of the "known" images on the computer and the printed pages were created outside the State of Colorado. The images originated in the states of Connecticut, Florida, Georgia, Indiana, Kentucky, Michigan, Missouri, Montana, North Carolina, Pennsylvania, and Washington, and the countries of Austria, Belgium, Brazil, England, France, Germany, Norway, and Paraguay.

Two of the known images were saved in the "New Folder" section of the computer described by the defendant. These known images were from the "Tara" series of known child pornography. The images showed a naked prepubescent female child having sexual intercourse with an adult male.

The printed pages contained 12 images of known child pornography. These known images included an image from the "Blue Shirt Girl" series in which a young girl is shown giving oral sex to a preteen male while having sexual intercourse with an adult male. Another image, from the "IM" series of known child pornography, shows a prepubescent female giving oral sex to an adult male while a sexual device, often referred to as a vibrator or "dildo," is inserted into her vagina. Yet another image, from the "Helen" series, shows a prepubescent female, naked from the waist down, having sexual intercourse with an adult male. Another page showed a collage of images from the "Helen" series. These images included a prepubescent female having oral sex with an adult male, a prepubescent female having sexual intercourse with an adult male, and a prepubescent female lasciviously displaying her vagina to

>
> the camera. Other images from the printed pages showed minors engaged in oral and vaginal sex, as well as the lascivious display of the genitalia of minors.
>
> Simultaneous with the federal child pornography investigation, state law enforcement officers investigated allegations of improper sexual contact between the defendant and the 11-year-old female neighbor. During an interview with law enforcement [officers], the 11-year-old minor said the defendant had touched her "privates" on approximately 50-100 occasions when she visited his home. The child said the defendant always touched her genital area through her clothing; there was never any penetration of any kind. In July 2010, the defendant pled guilty to, and was convicted of, the felony offense of Sexual Assault on a Child - Victim less Than 15 in Rio Grande County, Colorado, Case Number 2009CR193. In that case, the defendant received 90 days of jail followed by 10 years of sex offender specific probation.

Parties' Proposed Plea Agreement and Statement of Facts Relevant to Sentencing, 12-16.

### DISCUSSION

At a minimum, I must ensure that Mr. Vanderwerff's plea is voluntary and intelligent. *See Mendoza v. Hatch*, 620 F.3d 1261, 1269 (10th Cir. 2010). To ensure the integrity of the judicial process, however, I must also exercise my discretion to determine whether or not the parties' proposed plea agreement is appropriate. Once the parties have reached a negotiated disposition, the adversarial nature of their relationship evaporates. In such a situation, neither the prosecutor nor the defendant are likely to cite relevant facts or raise otherwise meritorious arguments that threaten to upset their plea bargain. In such situations, only a judge is sufficiently disinterested in the bargain to examine its validity.

My exercise of discretion is not informed by fungible considerations readily applicable to any criminal defendant; instead, I must conduct a case-specific inquiry which results in a decision based upon what is fair under the circumstances and guided by the rules and principles of law. *See Valley Forge Ins. Co. v. Health Mgmt. Partners, Ltd*, 616 F.3d 1086, 1096 (10th Cir. 2010). That inquiry applies to each bargained-for provision, including a defendant's waiver of

his statutory right to appeal any matter in connection with his prosecution.

### *Plea Bargaining*

"[C]riminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 132 S. Ct. 1376, 1388 (2012). With those words, Justice Kennedy acknowledged what has long been reality: the criminal trial has become an anachronism.[1] As noted by Justice Scalia, the Supreme Court has "elevate[d] plea bargaining from a necessary evil to a constitutional entitlement." *Lafler*, 132 S. Ct. at 1397 (Scalia, J. dissenting). A product of our legal system, plea bargaining's prevalence is largely attributable to mounting caseloads and the rising costs, both financial and temporal, of the modern criminal trial.[2] Armed with the power to dismiss charges and suggest more lenient sentences, prosecutors have conserved scarce resources by inducing criminal defendants to plead guilty and waive their constitutional right to trial by jury.

These gains in efficiency are not, however, without consequence. As a result of a guilty plea, bargained for or otherwise, and the concomitant waiver of the right to trial by jury, a criminal defendant also waives his rights to confront and cross-examine adverse witnesses, to

---

[1] Justice Kennedy's observation was hardly groundbreaking. Commentators first noted the prevalence of plea bargaining nearly ninety years ago. *See* Justin Miller, *The Compromise of Criminal Cases*, 1 S. Cal. L. Rev. 1 (1927); Raymond Moley, *The Vanishing Jury*, 2 S. Cal. L. Rev. 97 (1928). The Court's application of the Sixth Amendment in the plea bargaining context, however, marks a significant development.

[2] Some commentators have posited a third reason: plea bargaining allows prosecutors to secure convictions even in weak cases. *See* Albert W. Alschuler, *The Prosecutor's Role in Plea Bargaining*, 36 U.Chi.L.Rev. 50,59 (1968); Note, *The Unconstitutionality of Plea Bargaining*, 83 Harv.L.Rev. 1387, 1389 (1969). For an excellent discussion of plea bargaining's rise to prominence in the American legal system, *see* George Fisher, Plea Bargaining's Triumph (Stanford Univ. Press 2003).

present evidence, to compel the attendance of witnesses, and to require prosecutors to prove guilt beyond reasonable doubt.[3] The glut of plea bargaining and the pandemic waiver of these rights have rendered trial by jury an inconvenient artifact.[4]

The pervasive waiver of individual rights has fundamentally altered the function of the courts. The act of judging, once central to the determination of guilt or innocence, has been shunted to the margins. A defendant's "guilt" is, more often than not, preordained by the grand jury's indictment. To the extent judges actually participate in the criminal process, the push is to relegate us to approving or disapproving proposed plea bargains and, unless the plea contains a negotiated sentence, determining an appropriate sentence. As characterized by Justice Scalia, the modern plea bargaining regime reflects "the sporting-chance theory of criminal law, in which the State functions like a conscientious casino-operator, giving each player a fair chance to beat

---

[3] These rights form the core of the Sixth Amendment, which provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI. Widespread plea bargaining also implicates the Fifth Amendment's protection from compulsory self-incrimination. A more thorough treatment of this issue can be found in the Cardozo Law Review's symposium entitled, *The Future of Self-Incrimination: Fifth Amendment, Confessions, & Guilty Pleas*. 30 Cardozo L. Rev. 717-1140 (2008).

[4] In 2010, only 2.8% of federal criminal defendants exercised their right to a trial; only 2.4% exercised their Sixth Amendment right to trial by jury. During that same time period, 88.9% of federal criminal defendants entered into plea agreements. *See* The Sourcebook of Criminal Justice Statistics, Criminal Defendants Disposed of in U.S. District Courts, Table 5.22.2010, *available at* http://albany.edu/sourcebook/pdf/t5222010.pdf.

the house, that is, to serve less time than the law says he deserves." *Lafler*, 132 S. Ct. at 1398 (Scalia, J., dissenting).

Prioritizing efficiency at the expense of the individual exercise of constitutional rights applies to the guilty and the innocent alike, and sacrificing constitutional rights on the altar of efficiency is of dubious legality. As noted by Justice Scalia, plea bargaining "presents grave risks of prosecutorial overcharging that effectively compels an innocent defendant to avoid massive risk by pleading guilty to a lesser offense . . . ." *Id.* at 1397 (Scalia, J. dissenting). A rational defendant, even if innocent, may plead guilty to a lesser offense in order to minimize the risk of prosecution. Each plea bargain, therefore, and its concomitant prioritization of efficiency at the expense of the individual exercise of constitutional rights or the exercise of judicial responsibility, requires close scrutiny.

*Appellate Waivers*

In the wake of the Supreme Court's holding that the U.S. Sentencing Guidelines are merely advisory, not mandatory, *see United States v. Booker*, 543 U.S. 220, 247 (2005), no circuit court has revisited the enforceability of appellate waivers. Sentencing, post-*Booker*, requires a trial court to consider context and to apply criteria rather than perform a mechanical or clerical entry of a matrixed judgment. *See United States v. Calderon-Villaneuva*, 1:12-cr-235, Order Denying Unopposed Motion to Enter into Plea Agreement Containing an Appeal Waiver (doc. 14) (D. Colo. June 28, 2012). Ethical and moral values inevitably infuse the decision-making process, but they must be justified by being drawn from governing texts in statutes and judicial opinions and established principles of fairness generally accepted by the community affected by the criminal conduct, *i.e.,* the fundamental values widely accepted by society and

identifiable as such.

The responsibility of appellate review is to decide how well the sentencing judge has established the sentence within this described discipline. That is fundamentally dissimilar to the pre-*Booker* function of determining whether an arithmetic calculation has been executed correctly. Rather, reviewing sentences under an abuse of discretion standard is a complex inquiry meant to assure that the judicial administration of justice is relevant to the values and expectations of society.

Indiscriminate acceptance of appellate waivers undermines the ability of appellate courts to ensure the constitutional validity of convictions and to maintain consistency and reasonableness in sentencing decisions.  Indeed, appellate waivers would have insulated from review the underlying convictions in some of the most notable criminal decisions in the Supreme Court's recent history.  *See* Nancy J. King and Michael E. O'Neill, *Appeal Waivers and the Future of Sentencing Policy*, 55 Duke L. J. 209, 249 (2005) (noting that waivers would have precluded appellate review in *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); and *United States v. Booker*, 543 U.S. 220 (2005)). Thus, such waivers should only be included where they are justified by the facts and circumstances of a particular case.

### *Mr. Vanderwerff's Proposed Plea Bargain*

Pursuant to the authority cited in the foregoing discussion, I must weigh the facts and circumstances of Mr. Vanderwerff's case to determine whether to accept his proposed plea bargain and the appellate waiver contained therein.  In his proposed plea bargain, Mr.

Vanderwerff has agreed to plead guilty to Count 2 of the indictment in exchange for the dismissal of Counts 1 and 3 of the indictment.[5] Having reviewed the facts of this case, and the applicable law, I find this aspect of his plea bargain is not unconscionable and therefore it is appropriate to defer to prosecutorial discretion. The inclusion of an appellate waiver is, however, unjustified.

The parties' arguments in support of the proposed appellate waiver echo the general justifications for their enforceability. As summarized by the government, "A waiver of appellate rights can be of great value to an accused as a means of gaining concessions from the government. Appellate waivers also benefit the government by saving them time and money involved in arguing appeals. And society benefits from the finality that waivers bring."[6] United States' Brief in Support of Plea Agreement (doc. 18), at 4 (quoting *United States v. Elliott*, 264 F.3d 1171, 1174 (10th Cir. 2001)). Although such considerations may support the general enforceabilty of appellate waivers, they are irrelevant to my determination of whether an appellate waiver is justified in the context of this case.

The parties' case-specific arguments are similarly unavailing. First, they argue that Mr. Vanderwerff's willingness to waive his appellate rights "demonstrates [his] remorse and high

---

[5] The dismissal of Counts 1 and 3 eliminates the statutory mandatory minimum sentence of five years and lowers the potential maximum period of imprisonment from twenty to ten years.

[6] Although tangential to the instant controversy, I take this opportunity to note my disagreement with the Tenth Circuit's contention that appellate waivers are strongly supported by public policy. The above list of public policy considerations is not exhaustive; it omits the significant public interest served by appellate review. Appellate review allows for the development and refinement of important constitutional issues, and it ensures reasonableness of judicially imposed sentences.

level of responsibility for his criminal actions." United States' Brief in Support of Plea Agreement (doc. 18), at 6; *see also* Defendant's Statement in Support of Accepting Plea Agreement with Appellate Waiver (doc. 17), at 3. This argument ignores the nature of Mr. Vanderwerff's bargain. In exchange for his guilty plea and his waiver of the right to appeal, the government is dismissing two charges – charges for criminal activity which the government had probable cause to believe Mr. Vanderwerff committed. This is the antithesis of acceptance of responsibility. *See* U.S.S.G. § 3E1.1 and Commentary.

The parties also argue that the dismissal of charges 1 and 3 will result in a statutory sentencing range that better accommodates the interests of justice and the strictures of 18 U.S.C. § 3553. If found guilty of all charges, Mr. Vanderwerff would face a statutory sentencing range of five to twenty years of incarceration. This is clearly what Congress intended, yet his proposed plea bargain would result in a statutory sentencing range of probation to ten years.

Although I could sentence Mr. Vanderwerff to any sentence within that range, as part of his proposed plea bargain Mr. Vanderwerff agrees not to actively seek a sentence of less than five years – the statutory minimum he would face if convicted of all charges. In effect, the parties seek to limit Mr. Vanderwerff's sentence to a range of five to ten years of incarceration. Although these sentencing consequences may have induced Mr. Vanderwerff to accept the government's plea bargain, they do not justify including an appellate waiver. The interests of justice as I perceive them are best served by permitting the calm and deliberate review by the Court of Appeals of my decision and how it conforms to the requirements of 18 U.S.C. § 3553.

## CONCLUSION

The proposed plea bargain is rejected because of the above-stated reasons. This case will

be set for trial by jury.

    Dated: June 28, 2012　　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　　　　　　　　**/s/ John L. Kane**
　　　　　　　　　　　　　　　　　　　　　　　　　Senior U.S. District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.      12-cr-00069-JLK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

TIMOTHY JOHN VANDERWERFF,

       Defendant.

_____

### DEFENDANT'S NOTICE OF APPEAL
_____

On June 28, 2012, this Court, the United States District Court for the District of Colorado, entered an order rejecting the plea agreement reached between the United States of America and the Defendant, Timothy John Vanderwerff, acting through the undersigned, Assistant Federal Public Defender Edward R. Harris. The sole basis for the order rejecting the plea agreement was the agreement's inclusion of an appeal waiver. Mr. Vanderwerff files this notice of his appeal of the order to the United States Court of Appeals for the Tenth Circuit.

       Respectfully submitted,

       RAYMOND P. MOORE
       Federal Public Defender

       s/ Edward R. Harris
       Edward R. Harris
       Assistant Federal Public Defender
       633 17th Street, Suite 1000
       Denver, CO  80202
       Telephone:  (303) 294-7002
       FAX:  (303) 294-1192
       Edward_Harris@fd.org
       Attorney for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2012, I electronically filed the foregoing **DEFENDANT'S NOTICE OF APPEAL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Richard A. Hosley, Assistant United States Attorney
    Richard.hosley@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mr. Timothy J. Vanderwerff      *via U.S. mail*

    s/ Edward R. Harris
    Edward R. Harris
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone:  (303) 294-7002
    FAX:  (303) 294-1192
    Edward_Harris@fd.org
    Attorney for Defendant